# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD BREDBENNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 11-739-SLR |
| | ) |
| ROBERT MALLOY, et al., | ) |
| | ) |
| Defendants. | ) |

---

Donald Bredbenner, Laurel, Delaware, Pro Se Plaintiff.

Daniel A. Griffith and Scott G. Wilcox, Esquires, Whiteford, Taylor & Preston, L.L.C., Wilmington, Delaware, Counsel for Defendants Robert Malloy, Ihoma Chuks, and Correct Care Solutions LLC.

Ryan Patrick Connell, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Defendant Sgt. Doane.

---

## MEMORANDUM OPINION

Dated: February 30 , 2013
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Donald Bredbenner ("plaintiff"), a former inmate at the James T. Vaughn

Correctional Center ("VCC"), Smyrna, Delaware, filed his complaint pursuant to 42

U.S.C. § 1983. He proceeds pro se and has been granted leave to proceed without

prepayment of fees. Presently before the court are several discovery motions (D.I. 45,

55, 56, 59, 84) filed by plaintiff, motions for summary judgment (D.I. 60, 75) filed by

defendants, a motion to stay discovery (D.I. 65) filed by defendant Sgt. Doane

("Doane"), motions for sanctions (D.I. 68, 69) filed by plaintiff, and motions to strike (D.I.

71, 73) filed by plaintiff. The court has jurisdiction pursuant to 28 U.S.C. § 1331. For

the reasons discussed, the court will deny: (1) plaintiff's discovery motions (D.I. 45, 55,

56, 59,82); (2) plaintiff's motions for sanctions (D.I. 68, 69); (3) plaintiff's motions to

strike (D.I. 71, 73); (4) defendants' motions for summary judgment (D.I. 60, 75); and (5)

Doane's motion to stay discovery (D.I. 65).

## II. BACKGROUND

Plaintiff filed this action pursuant to 42 U.S.C. § 1983 alleging violations of his

constitutional rights by virtue of defendants' alleged deliberate indifference to serious

medical needs. The court screened the complaint pursuant to 28 U.S.C. § 1915 and

§ 1915A and allowed plaintiff to proceed with claims against Doane, as well as medical

defendants Robert Malloy ("Malloy"), Ihoma Chuks ("Chuks"), and Correct Care

Solutions ("Correct Care")[1] ("collectively medical defendants"). The court dismissed the

---

[1]Improperly named as Correctional Care Solutions.

claims against defendants Michael Deloy, Chris Kline, and Warden Phelps.

On the afternoon of December 22, 2010, plaintiff was knocked to the ground on the basketball court and injured his arm. Plaintiff asked Doane for medical attention, but Doane did not call medical or send plaintiff to medical. That night, the evening corporal saw plaintiff's swollen wrist and took him to the sergeant on duty who immediately called medical and sent plaintiff for medical attention. Robert Davenport ("Davenport"), the nurse on duty, telephoned the on-call physician, and provided treatment and pain medication. Medical records indicate that Davenport ordered an x-ray, scheduled a follow-up appointment, and advised plaintiff to return if there were worsening of conditions. Plaintiff alleges that Davenport placed plaintiff on the sick call list for 9:00 a.m. the next morning. Davenport's physician orders state, "f/u w ppt. 12/23/10." The next morning plaintiff went out when medical was called, but Doane said that plaintiff was not on the list, and he would not call medical to confirm that plaintiff had been added to the list. An x-ray was taken on December 24, 2010. (D.I. 2, D.I. 76)

On December 28, 2010, plaintiff was seen by Chuks, a nurse practitioner. When plaintiff presented, Chuks had not yet reviewed the x-ray because the result was not in the chart. Chuks reviewed the x-ray and it revealed an acute fracture of the distal radius, mild displacement and intraarticular extension. An orthopedic consultation was written for plaintiff to see Dr. DuShuttle, and the form was given to the consult clerk marked "urgent." According to plaintiff, Chuks told him that he would have to be sent out and could not be treated at VCC. Chuks was aware that VCC was not equipped with medical devices and personnel who specialized in treating a broken wrist. (D.I. 2, D.I. 57, ans. to interrog. 5, D.I. 76)

On December 31, 2010, plaintiff submitted a grievance in an effort to obtain treatment. Because the grievance complained of acts by Doane as well as requesting medical attention, it appears the two issues were decided separately, but given the same grievance number - 217351. Plaintiff complained that Doane had not called medical after he injured his wrist and that Doane refused to let him go to medical on December 23, 2010 because plaintiff was not on the list ("Doane grievance"). The grievance noted that plaintiff had been seen by medical on December 28, 2010. Plaintiff requested that he be "sent out to specialist immediately," receive x-rays, appropriate treatment, and pain medication ("medical grievance"). The Doane grievance was sent to Kimberly Tribbitt ("Tribbitt") for an investigation. She reported on the informal resolution that the Doane grievance was not an emergency grievance, that it mentioned only security staff, and that if plaintiff had an issue with security staff he is to write to the unit commander. (D.I. 2, exs.)

The medical grievance was referred for investigation of the emergency request for an outside consult to review the fracture. In the meantime, when no "real treatment" had been provided, plaintiff wrote to health services administrator Malloy on January 7, 2011 for assistance. Plaintiff had been given Malloy's name after someone spoke to Malloy about plaintiff's situation. Malloy said for plaintiff "to write to him and he would get [plaintiff] out to the specialist." In Malloy's answer's to interrogatories, he states that he was not made aware of plaintiff's injuries prior to the filing of the lawsuit. (D.I. 2, exs., D.I. 58 ans. to interrog. 1)

3

Dr. DuShuttle examined plaintiff on January 13, 2011, and diagnosed a Colles fracture of the left distal radius.[2] He described the fracture as a closed comminuted[3] minimally displaced fracture and noted that plaintiff had sustained the injury "weeks ago." Plaintiff had arrived with a splint applied to the left wrist, and Dr. DuShuttle applied a thumb splint, ordered a repeat x-ray, and directed plaintiff to work on his range of motion. In his complaint, plaintiff alleges that Dr. DuShuttle told him that, had he seen him at the time of the injury, he would have needed simple surgery but, because of the delay, he would have to re-break the bone to set it and install a steel plate and pins. (D.I. 2, D.I. 76)

On January 17, 2011, plaintiff wrote a letter to Correct Care complaining of his recent "mistreatment." (D.I. 2, ex., D.I. 76) On January 25, 2011, the medical grievance committee recommended denial of the medical grievance. The form indicates that plaintiff's remedy had been resolved, but he refused to sign off. Plaintiff appealed on January 31, 2011, stating that he was not satisfied because his left wrist remained untreated except for the initial first aid, it took three weeks to see a physician for a fractured bone and over three weeks for any acknowledgment of other issues, and the treatment to correct the fracture was requested immediately but "it did not happen." (D.I. 2)

---

[2]A Colles fracture is a bone fracture of the radius of the wrist in which the lower fragment becomes displaced dorsally. *The American Heritage Stedman's Medical Dictionary* 169 (2d ed. 2004).

[3]Broken into fragments. Used of a fractured bone. *The American Heritage Stedman's Medical Dictionary* 171 (2d ed. 2004).

4

On February 8, 2011, the bureau grievance officer voted to deny the appeal noting that plaintiff was seen by the duty nurse on December 22, 2010, had an x-ray on December 24, 2010, received follow-up on December 28, 2010, and an outside consultation on January 13, 2011. It was further noted that no sick call slips were submitted subsequent to the December 22, 2010 injury date, the consultation remains pending, and that Correct Care continues to follow the case. On February 10, 2011, plaintiff was provided follow-up care by Dr. DuShuttle who recommended physical therapy. On February 19, 2011, the bureau chief voted to deny the appeal and advised plaintiff of the denial on the same date. (D.I. 2, exs., D.I. 76)

Plaintiff presented to Dr. DuShuttle on March 2, 2011. Dr. DuShuttle found mild improvement. He advised plaintiff he would have a permanent problem with the wrist noting the fracture was intraarticular and first seen by him "after three weeks." He further advised plaintiff that there was a good chance he would develop arthritis and would need surgery in the future. When plaintiff returned to Dr. DuShuttle on April 7, 2011, Dr. DuShuttle recommended surgery that included ulna shortening with plating triangular fibrocartilage complex resection. Surgery was performed on June 29, 2011. Plaintiff continued to see Dr. DuShuttle for follow-up through January 2012. Plaintiff filed the instant lawsuit on August 19, 2011.

On May 3, 2012, the court set a September 4, 2012 discovery deadline and an October 4, 2012 deadline for filing summary judgments. (D.I 30) Doane filed a motion for summary judgment on September 4, 2012 and medical defendants filed a motion for summary judgment on October 4, 2012. (D.I. 60, 75)

## III. DISCOVERY MOTIONS

On July 3, 2012, plaintiff propounded interrogatories upon Doane, which were answered on August 2, 2012. (*See* D.I. 44, 51) On July 5, 2012, plaintiff filed a motion to obtain discovery from medical defendants. (*See* D.I. 45) The motion appears to be a motion to compel discovery, but there is no indication that plaintiff sought discovery from medical defendants prior to filing the motion as is required by the Federal Rules of Civil Procedure. Therefore, the court will deny the motion.

On July 10, 2012, plaintiff propounded interrogatories upon medical defendants (D.I. 46, 47, 48) and non-parties Marge Slack ("Slack"), the regional office manager for Correct Care (D.I. 47), and Davenport (D.I. 49). When plaintiff had not received medical defendants' and non-parties' answers to interrogatories, he filed two motions to compel, one on August 21, 2012 (D.I. 55) and one on August 24, 2012 (D.I. 56). The August 21, 2012 motion to compel is directed to Doane. Doane, however, fully answered the interrogatories without objection. Therefore, the court will deny the August 21, 2012 motion to compel.

Chuks and Malloy answered their interrogatories on August 24, 2012, the same day that plaintiff filed a motion to compel them to respond to discovery. (*See* D.I. 57, 58) While the answers were not timely filed, both Chuks and Malloy fully answered the interrogatories.[4] Therefore, the court will deny the August 24, 2012 motion to compel as to Chuks and Malloy. In addition, the court will deny as moot plaintiff's motion to strike Chuks' and Malloy's response to plaintiff's first set of interrogatories (D.I. 73).

---

[4]Chuks objected to many interrogatories, but she also answered them.

With regard to non-parties Slack and Davenport, Fed. R. Civ. P. 33, which provides for propounding interrogatories upon parties, is inapplicable. Therefore, the court will deny the August 24, 2012 motion to compel as to non-parties Slack and Davenport.

Plaintiff filed yet another motion to compel on August 27, 2012, directed to medical defendants to produce documents. (See D.I. 59) It is not clear to the court when plaintiff served the request for production of documents upon medical defendants. The court docket reflects, however, that medical defendants provided plaintiff the documents requested on September 6, 2012. (See D.I. 62) Therefore, the court will deny as moot the August 27, 2012 motion to compel.

On September 11, 2012, Doane filed a motion to stay discovery (D.I. 65) with respect to plaintiff's discovery requests to the Delaware Department of Correction ("DOC"). Plaintiff moves to strike the motion to stay (D.I. 71). On November 20, 2012, plaintiff filed a motion to depose numerous individuals (D.I. 84) claiming that counsel for Correct Care blocked him from obtaining discovery. Although not stated, it appears he wishes to extend the discovery deadline.

As set forth in the court's scheduling order, discovery ended on September 4, 2012. Plaintiff did not seek to take depositions prior to the discovery deadline. Moreover, he waited more than two months until after discovery ended and one month after the deadline to file summary judgment motions before seeking the depositions. The court finds that plaintiff has failed to provide good reason to reopen discovery.

Therefore, the motion for depositions will be denied.[5] In addition, the court will deny as moot the motion to stay discovery and the motion to strike the motion to stay.

Finally, plaintiff has filed two motions (D.I. 68, 69) seeking the imposition of sanctions against all defendants on the grounds that they have not adequately responded to discovery. As discussed above, the court has determined that defendants have adequately responded to discovery. Therefore, the court will deny the motions for imposition of sanctions.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed

---

[5]Even had the court reopened discovery, it is plaintiff's responsibility to pay the costs associated with the taking of depositions. While plaintiff appears pro se and has been granted leave to proceed in forma pauperis, the court has no authority to finance or pay for his discovery expenses. See Badman v. Stark, 139 F.R.D. 601, 605 (M.D. Pa.1991) (§ 1915 does not require the government to advance funds for deposition expenses). In addition, plaintiff wishes to depose non-defendants. He cannot, without issuing subpoenas, and he may not issue subpoenas without paying the required fees. See Fernandez v. Kash N' Karry Food Stores, Inc., 136 F.R.D. 495, 496 (M.D. Fla. 1991) (witness and mileage fees required to be paid by indigent plaintiff). Finally, the taking of depositions would entail stenographic or court reporter expenses which this court is not authorized to pay.

8

issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The rules are no different when there are cross-motions for summary judgment. *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

Doane moves for summary judgment on the grounds that plaintiff failed to exhaust his administrative remedies as is required under the Prison Litigation Reform Act ("PLRA") pursuant to 42 U.S.C. § 1997e. (D.I. 60, 61) Plaintiff moves to strike Doane's motion for summary judgment and supporting memorandum. (D.I. 71) Medical defendants move for summary judgment on the grounds that plaintiff failed to:
(1) present any evidence that they were deliberately indifferent to his medical needs;
(2) present expert testimony to support his claim; (3) allege and prove that Correct Care

9

was involved in his treatment or had a custom or policy of deliberate indifference; and (4) demonstrate that Malloy was aware or involved in any way in plaintiff's treatment. (D.I. 75)

## B. Discussion

### 1. Administrative remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Defendants have the burden of pleading and proving failure to exhaust administrative remedies as an affirmative defense in a § 1983 action. *Ray v. Kertes*, 285 F.3d 287, 295-96 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).

"'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007)

10

(quoting *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)). A prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. *Nickens v. Department of Corr.*, 277 F. App'x 148, 152 (3d Cir. 2008) (unpublished) (citing *Williams*, 482 F.3d at 639; *Spruill*, 372 F.3d at 228, 231). Perfect overlap between the grievance and a complaint is not required by the PLRA as long as there is a shared factual basis between the two. *Jackson v. Ivans*, 244 F. App'x 508, 513 (3d Cir. 2007) (unpublished) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance."). A futility exception to the PLRA's mandatory exhaustion requirement is completely precluded. *Banks v. Roberts*, 251 F. App'x 774, 776 (3d Cir. 2007) (unpublished) (citing *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000)). The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill*, 372 F.3d at 227-28; *Nyhuis*, 204 F.3d at 67. A grievance procedure is not available, even if one exists on paper, if the defendant prison officials somehow prevent a prisoner from using it. *Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003). If prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002). Finally, prison authorities may waive the exhaustion requirement if the ultimate administrative authority fully examines the inmate's complaint on the merits, regardless of whether the complaint complied with the prison grievance process. *See McKinney v. Guthrie*, 309 F. App'x 586, 587 (3d Cir. 2009) (unpublished) (citing *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000)).

Doane contends that plaintiff did not properly exhaust his administrative remedies because he did not timely submit his grievance. Plaintiff submitted his grievance on December 31, 2010, complaining of Doane's December 22 and 23, 2010 actions. DOC regulations provide that the grievance process begins when an inmate completes and files form #584 within seven calendar days following the incident and forwards it to the inmate grievance chair. DOC Policy 4.4 (revised May 15, 1998). Doane argues that, because plaintiff did not follow the time requirement for submitting grievances, plaintiff cannot show that he exhausted his administrative remedies as to the allegations raised against Doane.

It is evident in reviewing plaintiff's grievance and the informal resolution that, with regard to complaints regarding Doane, prison officials waived the time requirement for exhausting the administrative remedies. No mention is made that the grievance was submitted either one or two days late. Notably, the informal resolution addressed the merits of plaintiff's claim against Doane. The informal grievance notes that, because plaintiff mentioned security staff, his remedy was to raise the issue by writing to his unit commander rather than through the grievance process. It is apparent that there is no remedy available to him.

Hence, Doane's position that plaintiff failed to exhaust his administrative remedies fails on two counts: (1) prison officials waived the seven-day time requirement for submitting a grievance and addressed its merits; and (2) there was no administrative remedy available to plaintiff through the grievance process as evidenced by the position of the prison officials that plaintiff's remedy was not through the

grievance procedure but to raise the issue with his unit commander. Therefore, for the above reasons, the court will deny the motion for summary judgment.

## 2. Medical needs

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (unpublished) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. at 107. "[M]ere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

13

When a plaintiff relies upon a theory of respondeat superior to hold a corporation

such as Correct Care liable, he must allege a policy or custom that demonstrates

deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v.

Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to

establish that Correct Care is liable for the alleged constitutional violations, plaintiff

"must provide evidence that there was a relevant [] policy or custom, and that the policy

caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden Cnty. Corr.

Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious

liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under

contract with the state cannot be held liable for the acts of its employees and agents

under those theories).

Assuming the acts of employees of a corporate medical provider have violated a

person's constitutional rights, those acts may be deemed the result of a policy or

custom of the entity for whom the employee works, thereby rendering the entity liable

under § 1983, where the inadequacy of existing practice is so likely to result in the

violation of constitutional rights that the policymaker can reasonably be said to have

been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations

omitted). "'Policy is made when a decisionmaker possess[ing] final authority to

establish . . . policy with respect to the action issues an official proclamation, policy or

edict.'" *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992)

(alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d

Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course

of conduct, although not specifically endorsed or authorized by law, is so well-settled

14

and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480;
*Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

### a. Proper care and personal involvement

Medical defendants move for summary judgment on the grounds that the
evidence of record indicates that plaintiff was provided proper care for the injured wrist.
In addition, they contend that plaintiff failed to demonstrate that Malloy was aware, or
involved in any way, with regard to plaintiff's treatment.

Medical defendants observe that plaintiff received medical treatment from a
nurse the evening of his injury, he was x-rayed two days later, and seen by nurse Chuks
six days following the injury who sought an orthopedic consultation. Plaintiff was
evaluated by Dr. DuShuttle three weeks following the injury and seen by him on
numerous occasions before Dr. DuShuttle performed surgery. Conversely, plaintiff
argues that medical defendants' delay in treating his fractured wrist violated his
constitutional rights. Plaintiff points out that it was two days before his wrist was x-
rayed, six days before he was seen by medical personnel for a review of the x-ray
results, and twenty-one days before he was seen by an orthopedic specialist. He
contends that Chuks treated the orthopedic consultation as a routine request for an
outside evaluation rather than as an emergency.

Plaintiff was seen by medical on the evening of December 22, 2010, and the
record reflects that plaintiff was scheduled to see medical on December 23, 2010. The
record makes no mention of any action taken by medical personnel when plaintiff did
not present for the December 23, 2010 follow-up. The record further reflects that the
wrist x-ray, taken two days after plaintiff's injury, indicated that the wrist was broken, yet

15

nothing was done medically. When plaintiff saw Chuks on December 28, 2010, six days after the injury, she reviewed the x-ray results, was aware plaintiff's wrist was broken, and knew that VCC was not equipped with medical devices and personnel specialized to treat a broken wrist. Although Chuks submitted an "urgent" request for plaintiff to have an orthopedic consultation, dated December 28, 2010, the record does not indicate when the request was approved, or if Chuks monitored the request to verify that an appointment was timely scheduled. Nor does the record reflect why an appointment was not scheduled until January 21, 2011. Moreover, the record does not explain why plaintiff was never seen by a physician at VCC during the three weeks prior to the time he was evaluated by Dr. DuShuttle on January 21, 2011.

In addition, plaintiff was vocal in his efforts to obtain medical treatment. He submitted a medical grievance on December 31, 2010,[6] and he wrote to Malloy on January 7, 2011 seeking treatment (having been told that, if he wrote to Malloy, Malloy would get plaintiff out to see a specialist).[7] Regardless, this did not prompt treatment by a physician. In addition, there is no evidence in the record that the delay in treatment was based on medical reasons. Indeed, other than to posit unsupported theories, medical defendants have provided no explanation for the delay. *See Monmouth Cnty. Corr. v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987) (deliberate indifference can be shown when medical treatment is delayed for non-medical reasons).

---

[6]Grievance documents indicate that investigation began on January 4, 2011.

[7]In his letter to Malloy, plaintiff indicated that he had been told an appointment with an orthopedic specialist had been scheduled, but more than a week had passed, and he had yet to receive treatment.

16

Finally, medical records evidence that plaintiff was injured as a result of the delay. Dr. DuShuttle's notes make specific mention of the three week delay, that plaintiff will have a permanent problem with the wrist, that there is a good chance that he will develop arthritis, and that he will need surgery in the future. *See Murphy v. Walker*, 51 F.3d 714, 720 (7th Cir. 1995) (holding that broken hand is serious injury and permanent harm or "lingering disability" could result absent proper evaluation, possible realignment, and treatment). Dr. DuShuttle's portend of surgery came to fruition on June 29, 2011. Once plaintiff saw Dr. DuShuttle, he received appropriate, continuing treatment.

It is clearly established that plaintiff had the constitutional right to be free from unnecessary and wanton infliction of pain resulting from a delay in the provision of adequate medical care. *See Estelle*. Here, the record reflects that Chuks became aware of the broken wrist by December 28, 2010, and Malloy by at least January 7, 2010, yet there is no evidence that steps were taken to provide plaintiff with immediate medical care.

At this juncture, there remain issues of fact with regard to Malloy's awareness of involvement and in the adequacy of treatment provided plaintiff from the date of injury until he saw Dr. DuShuttle. For the above reasons, the court will deny medical defendants' motion for summary judgment.

### b. Expert testimony

Medical defendants contend that summary judgment is appropriate because plaintiff failed to present expert testimony to support his claim, and his claim is not apparent to a layperson. Plaintiff responds that, should this matter proceed to trial, he

17

"intends to put Dr. DuShuttle on the stand." "Where the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts, the jury itself is allowed to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Natale v. Camden Cnty. Correc. Facility,* 318 F.3d 575, 579 (3d Cir. 2003) (citations omitted). The factual predicate for a common knowledge case is one where "the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." *Id.*

Here, plaintiff has not identified an expert witness. However, in the event this matter goes to trial, plaintiff has indicated that he will call his treating physician as a fact witness to support his claim. Accordingly, the court will deny medical defendants' motion for summary judgment on the issue of expert testimony.

### c. Corporate defendant

Medical defendants move for summary judgment on behalf of Correct Care on the grounds that the complaint focuses on the actions or inactions of VCC medical and not Correct Care. Medical defendants argue that there is no evidence that Correct Care had an affirmative policy or custom that prevented VCC medical staff from treating plaintiff's injury, for treating his injuries improperly, or that it turned a blind eye to an obvious inadequate practice that was likely to, or did, result in a violation of plaintiff's constitutional rights. Plaintiff responds that, because Correct Care is the policymaker, it is responsible for steps taken by the medical staff through its action or inaction. (D.I. 81)

As discussed, Correct Care may be liable under § 1983 if it adopted a policy or custom that deprived plaintiff of his constitutional rights. There are "three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983," as follows: (1) where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself; and (3) where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need. *Natale*, 318 F.3d at 584 (internal quotations and citations omitted).

Plaintiff does not specifically point to a policy or custom that constitutes a constitutional violation, but it appears that Correct Care's medical staff followed policies and procedures with regard to plaintiff's care and the referral to Dr. DuShuttle. The record reflects that Chuks submitted a referral to Dr. DuShuttle, but does not indicate when the referral was approved or when medical staff attempted to schedule an appointment. By virtue of Chuks' submitted requests, and plaintiff's medical grievance and letter to Malloy, Correct Care was aware that plaintiff's wrist was fractured. Nonetheless, two weeks passed before plaintiff was seen by a physician. A reasonable juror could find that Correct Care knew that its policy or practice was ineffective but did nothing to ensure that plaintiff was promptly seen by a physician. There is no indication

19

in the record that Correct Care made a decision to act when it was obvious that the current policy was ineffective, as it resulted in a three week delay from the time of plaintiff's injury until he was seen by a physician. Further, as discussed above, Dr. DuShuttle's notes make specific mention of the three week delay and the effect it would have on plaintiff. Finally, as discussed above, there may be a constitutional violation under the deliberate indifference standard when medical care is delayed for non-medical reasons, and the record is silent as to the reason for the delay.

There is evidence in the record that Correct Care knew of the medical need (Chuks submitted a referral and plaintiff submitted a grievance) and the inference can reasonably be drawn that Correct Care knew that leaving a broken wrist untreated creates a serious risk of harm. Under these circumstances, there is an issue of fact as to whether policymakers at Correct Care knew of plaintiff's serious medical need but did nothing to address it. Therefore, the court will deny medical defendants' motion for summary judgment as to Correct Care.

## V. CONCLUSION

For the reasons discussed above, the court will deny: (1) plaintiff's discovery motions; (2) plaintiff's motions for sanctions; (3) plaintiff's motions to strike; (4) defendants' motions for summary judgment; and (5) Doane's motion to stay discovery. (D.I. 45, 55, 56, 59, 60, 65, 68, 69, 71, 73, 75, 84)

An appropriate order will be entered.

20